Case number 22-185 Eleanor Canter v. Disability Network, West Michigan, et al. Oral argument not to exceed 15 minutes for the plaintiff, 15 minutes to be shared by defendants. Philip Ellison, for the appellant, you may proceed. Thank you and good afternoon. My name is Philip Ellison and I'm here on behalf of the appellant, plaintiff Eleanor Canter. With the court's permission, I'd like to reserve five minutes for rebuttal. Certainly. Thank you. The case before you today has got three basic claims that are premised on the idea that Ms. Canter opposed and advocated against the illegal nature of the Heritage Square Commons building in Muskegon, Michigan. Her actions, while based on speech and email, were retaliated against by those who are responsible for the building and those who are responsible for the approval of that building, as well as enforcement of those types of claims going forward involving the wrongful existence of these types of buildings within the jurisdiction. It's our position today that Ms. Canter's advocacy and opposition to the way an ADA non-compliant building continues to exist is protected against retaliation under the seeking under the First Amendment. It's not that the city or the developer or the individuals that are involved with this building had to believe her. It's that they couldn't retaliate against her for her advocacy trying to seek remedy and relief on a building that, to this day, has not been decided not to comply with the ADA. In fact, right now, a case pending before the ADA is being violated is currently pending. Does it matter much whether it's a valid ADA claim or not? It's our position it's not. It does not directly matter. What matters is that there was retaliation on the basis of her advocacy on her well-founded belief, as well as her executed affidavit that says this isn't a violation of the ADA. So the lawsuit was not based on the honestly ridiculous and highly accusatory things that your client said about the disability rights organization? Well, the problem with that is that Disability Network West Michigan was turning itself in from being an organization that she is a beneficiary of and a member of, turning itself from being someone that's advocating for disability rights to turning into someone that is covering for violations of the very laws that these CILs were meant to advocate against. For example, a prime example of this as outlined in the brief is that these types of CILs are actually bringing court cases in other parts of Michigan to enforce the ADA rather than covering for the fact that the ADA violations that are occurring here are in fact to be brushed under the rug. Your evidence of quote-unquote covering is they get $7,500 for another purpose. There may have been a meeting between the disability organization and the city and it's really thin. What's the best evidence you have that there's some kind of impermissible collaboration going? You shouldn't have to look at your notes. You should just have this. Well, I'm going to give you three citations right to the record to establish that. It's ECF 115.31. Just tell me what they are. It's the March 22, 2019 determination by the city. This is city manager Frank Peterson's email concluding that in that very aspect that that building is ADA compliant and then turn around and the very same email says that Disability Network is going to become their partners. Less than approximately what? Eight days. The correlation between those two. Both things apparently happened on the same day. Otherwise, it's pretty hard to find a causation or correlation between the two. Well, the problem is that the problem in these types of cases like this is that there's... Well, I think we're more interested in this case and what the evidence is with respect to this case rather than these types of cases generally. Well, what I guess I would point to and I apologize, I got cut off for a moment there. I was going to identify three documents in the record I think is the bridge line between what could be an innocent set of circumstances versus a concerted effort. And that is ECF 115-31-35 and-43. Those three documents I think are the best evidence we have of a joint agreement between the developer, Disability Network, and those who work there to establish the fact that this was a concerted effort to quash the advocacy and opposition of Ms. Cantor for her advocacy against the building that she is asserting and has never been determined otherwise to have violated the ADA. These three documents... I wish I had recordings and firsthand notarized agreements from all of these individuals that they entered into in a conspiracy in this respect. But conspiracies as court case after court case of this court's even own precedence has established is that these things are never reduced to writing. And in fact, that circumstantial evidence is the key to understanding that these kinds of agreements exist. Now, if I can point this court, I think to what I think is the most important case... are based on the lawsuit that was filed against you, the defamation lawsuit against your client. And I think you don't oppose the idea that the standard we're supposed to apply is that that lawsuit can't serve as the basis for a retaliation claim unless the suit was just baseless itself. Totally disagree. I disagree with that. It doesn't have to be baseless. It has to be that the purpose behind it was designed to retaliate for either the... Where does that come from, that standard you just articulated? Well, the standard, as I outlined in the brief, First Amendment, the Rehab Act, and the retaliation provision of the ADA all use that same three-pronged retaliation standard that exists. So, for example, in the case of Wanks, for example, there was a case where there was a mandatory reporter. That was mandated by law that those individuals had to report. And still, this court found that was First Amendment retaliation, even though they had the duty to make that report. But that report was sufficient enough to establish that. I don't want to use all your time, but there's a legal question about what standard we apply for those statutory claims. And there's at least one case from the Supreme Court that addresses this in the NLRA context, I think. And it said, basically, unless the complaint is just absolutely baseless, the filing of the suit itself is conduct that's protected under, like, Norr Pennington and follow-on doctrines about petitioning the government. Do you dispute that? I don't think you really disputed in your brief that you disputed that was the standard. You disputed whether the standard was met. But as a legal question... To answer your question, I would point that that is not the standard, that the standard is this which establishes the idea that in that case, Central Michigan University, which is, of course, a university nearby where I'm from, sued a professor saying that you owe us money. And in fact, they had valid claims. But this court, and also on remand back to the district court judge, found that that lawsuit was retaliation for the speech that had occurred in that respect. So you can take... Was there a statutory violation alleged? Were these allegations that the lawsuit itself violated a statute or the statute was retaliation prohibited by a statute as opposed to First Amendment? Yours are statutory claims. My position is that the statute, at least as I've argued in the brief, is that the standard for the statutory claims and the First Amendment claims are similar. And so the idea here is that you're... And I think what you're getting at with your question is, is in fact that the fact that a court case could potentially be successful, preclusive of a First Amendment retaliation, or by my argument, the same standards as to the statutory claims. And this court has said no. The fact that a valid claim exists in state court is not in and of itself enough to bar. And Benison is, I guess, the best example, but there are others that are cited in our brief. But I would point this court to its Benison decision, where Central Michigan University was successful in arguing a breach of contract and got a money damages claim. And this court and the district court on remand both concluded that that lawsuit, despite being successful, was undertaken for First Amendment retaliation purposes. Now, my position, and I think I'm getting to your point is, at least I'm trying to here, is to say that these same standards for an ADA retaliation claim, or the conspiracy that under the First Amendment claims, apply the same standard. That simply because the fact that you may have a successful claim, and your purpose for bringing that successful claim was to retaliate for what is a prohibitive purpose, that is a basis that the jury has to decide as a question of fact, not to this court to act, not to create a question of law as a brick wall barrier to prevent those claims from going forward. Very briefly, if I just could, I have about 20 seconds left, I would point, I'd also like to just briefly say this court, the many courts, including I think this one are not being as faithful as they need to be to the, well, depending on who you ask, the Attucks case or Adekas case from the U.S. Supreme Court that lays out the standards in a civil conspiracy claim. And in the few seconds that I have left, I would ask this court to adopt that standard. You have no seconds left. You'll have your rebuttal time. Thank you. Mr. Curlew, you're next on behalf of the city, I believe. Thank you. Yes, Douglas Curlew, appearing on behalf of the city of Muskegon and Franklin Peterson. It seems to me difficult to tell from the record that the city didn't give every consideration to hearing the advocacy. Can you stop for just a second till the timer gets reset properly? Yes, Your Honor. I'm trying to fix that. Give me just a second, please. That's fine. Take what time you need. I just didn't want Mr. Curlew to keep talking. There we go. Okay. All right. Sorry. Sorry for the interruption. Not at all. I mean, from day one, the contracted building inspector Briggs not only responded immediately to Ms. Cantor's complaint, but offered to have her come in and talk to him, meet with him, talk about it, review plans. Franklin Peterson, at the meeting the following April, offered the same opportunity. In fact, there was the special meeting itself where that opportunity was offered. The city was willing to engage. The notion that Ms. Cantor was involved in this lawsuit, certainly the disability network needed no urging that I could perceive to file this lawsuit given the allegations that were made by Ms. Cantor of criminal activity to the organization. As far as the $7,500, there's no evidence that that was ever needed or put toward any lawsuit. It was just a matter of the city did exactly what Ms. Cantor would theoretically want it to do. It sought to engage with different advocates on behalf of the disabled. When they had the opportunity with the disability network to try to meet with them and address what they had said was to go beyond the bare minimum of accessibility for businesses in the city, they took that opportunity just as they did with Ms. Cantor. The fact that the city wishes to engage with disability advocates, I mean, Ms. Cantor can't claim that she's exclusive. There was nothing untoward about the city agreeing to deal with the disability network and look at their point of view. Is this the first time they'd ever entered into such kind of contract with the disability network? I can't say one way or another. It seems just based on the appearances that that was the first time they had agreed with the disability network, but perhaps the disability network's council would know, but I'm not aware of any prior agreement. But of course, it was Ms. Cantor's complaints that brought everything to the head. And remember, it was the disability network itself that and Mr. Hastings that the HBC building didn't comply. That was how they got involved in the first place. The city simply availed itself by meeting with Ms. Cantor, meeting with the disability network, hearing all sides of the dispute by the disability advocates all around. I think that certainly is as much engagement as any citizen should expect. There's certainly no proof that there was any retaliation against her. They remained open. As far as I know, the offer for her to come in and review plans at the outset remains open. If the panel has no questions, I really have nothing more to say. Okay. Was there a question? Well, I'd say the best case, your friend on the other side, I guess the best case would be maybe the best factual scenario is look, you've never paid the disability network like this before. We have a citizen who has voiced quite a few complaints, and wouldn't it be convenient for the city then with the disability network to help quiet those complaints, and this was a way to do it. The timing in that sense is not great because as you're right, as the city was considering her complaints is the same period of time they paid money, thousands of dollars to disability network for their consulting services. Right. But remember, conduct that's just as consistent with non-conspiratorial conduct isn't enough to show a conspiracy. The city was doing- The first time it happens, the timing in that sense maybe isn't great for you. But again, the point is that the city was trying to engage with disability advocates. They recognized Ms. Cantor called to their attention a problem, and they're trying to engage to solve that problem. I think she should be pleased with the city's response. All right. Mr. Shelberg, you'll be ready as soon as your timer goes, the timer's set properly. Okay. You may proceed. Thank you, Your Honor. And just to go after, just to kind of dovetail off after Mr. Curlew's point, there is absolutely no connection between the $7,500 contract and the lawsuit. The $7,500 contract, Judge, to answer your question, it was at least as far as the facts go that are evidence, the first time that Disability Network and the City of Muskegon have entered into any sort of agreement like that. But it was not for an agreement. It was for an agreement that was for things that were already going on. Disability Network had offered this ADA accessibility review to private organizations. It was a program that they were charging a couple hundred dollars to do. Again, it was a completely unauthoritative review. The Disability Network is a nonprofit. It has no ability to enforce the ADA or to officially highlight ADA violations. It was just a part of the community aspects that Disability Network was engaging in. It was a service that they were providing for and charging a nominal fee to cover the cost of doing it. The contract with the City was just an expansion of that. It was just to now be able to do this through the City to have the City be able to facilitate that unauthoritative service. So, it simply does not factor into the, as the District Court Judge, I believe, aptly called it, a thin thread, a few threads of evidence that Ms. Cantor is trying to knit into a whole sweater. It just... Mr. Shelberg, I'm sorry to interrupt you, but did the contract include consultation services with respect to HSC, the building that was at issue here? No, it had nothing to do with that. The Heritage Square building, it was not even part of the accessibility review contract. It was done, the Disability Network had come in under its private, that separate program that it had that was not part of the contract. In my few minutes, less than a few minutes that I have left, I want to make out one important point that was brought up in Ms. Cantor's reply, appellate reply brief that hasn't been addressed before, and that she raised the issue of Ms. Cantor being a former employee of the Disability Network. And I just want to make sure that this issue is addressed. One, she was an employee, I believe, in around 2008. And I don't have that, I was unable to find that date in preparation for this. But, and I don't even believe it's on the record in this case, but it was a very long time ago. Her statute limitation for raising any statutory claims, discrimination claims under the persons Disability Civil Rights Act, the ADA, Title VII, anything had long past. She never filed an EEOC charge. She never pursued her claim. On top of that, that issue just was frankly never raised in the court below. It should not even be an issue in this appeal. But I also want to touch very briefly on the fact that Ms. Cantor focuses extensively on the state case having been the case was being dragged out for so long, the Disability Network simply ran out of money to firm the case. And I was not counsel in that case. I am not privy to that decision-making process, other than what they've been told. But they have said in their pleadings in that case, we are dismissing this because we have run out of money. Simple as that. It was not... Well, what's your response to counsel's argument that Benison says that irrespective of whether or not the state case was actually meritorious, that that doesn't matter, it still can be retaliatory? Yeah, I don't think Benison applies here. And may I go over my time to answer your question, Your Honor? You may complete answering Judge Dyer's question. Yes, thank you. So, I don't think Benison applies here. I think Benison, as it was pointed out, that case did not apply to the statutory claims that are issued here. What applies here is the U.S. Supreme Court, B, E, and E construction, which was addressing the NLRA. But the retaliation claims under the NLRA have the same analysis as retaliation claims under the ADA, under the Rehabilitation Act, under Title VII, under 1983. And that is the core claims are you have protected activity, you have adverse action, and you need a causal connection between the protected activity and the causal connection. They all have the same analysis. Therefore, B, E, and E construction applies. The standard that it's set in terms of that you cannot shill meritorious lawsuits. You cannot shill the right of citizens to bring lawsuits. I think you need to bring this answer to a conclusion. I'll stop there, Your Honor. Thank you. All right. Mr. Bosch, you may proceed as soon as we get the timer set. There we go. Good afternoon, Your Honors. You know, I represent Gary Post. Mr. Post is the principal for the developer of this development at issue. He had nothing to do with this Muskegon County lawsuit that was subsequently dismissed. He had no involvement in its filing. He simply wanted his development to be approved and was jumping through whatever hoops the city or the representatives requested him to do. The idea that he conspired with somebody, I think Judge Neff indicated there were no facts to that he can't conspire with anyone who is not part of any such conspiracy. I know that the plaintiff's counsel, the appellant's counsel, argued that I had no standing to bring a summary judgment motion. I had raised that issue at the pre-motion conference with Judge Neff, indicated that I had excellent attorneys representing the other defendants, and I would merely be piggybacking on their summary judgment motions and indicating that clearly if there was no conspiracy with respect to anyone else, it would apply more so to Mr. Post. That was the basis for my concurrence. Judge Neff certainly recalled that and granted summary judgment with respect to Mr. Post as well. I've cited in my brief the court rule, rule 56, which allowed her to do that, to grant summary judgment with respect to a non-movement that was Mr. Post. He wasn't involved in the lawsuit. There's no evidence of any conspiracy irrespective of what this court does with respect to the other appellees. I believe Mr. Post should stay out of this case. If you have any questions. I think there are none. All right, Mr. Broadus. Good afternoon, your honors. Drew Broadus for the defendant appellate, Kirk Briggs. We haven't heard anything about Kirk Briggs, and that's consistent with the pleadings, which sort of just lumped him in with a list of all the other defendants. It's consistent with the briefing and the appeal, which says very little specific about him. It's consistent with well, he retaliated by conspiring to retaliate with everybody else. Mr. Briggs was properly dismissed. Again, to reiterate, he was sued in his individual capacity only, which is important as it relates to qualified immunity. That's discussed in my brief. I won't belabor that point other than to say he's got to be more than just wrong. The big argument against him was the fact that this building is not compliant. Again, it's never been established that that was a lie. We still don't have an adjudication that this building is not compliant, but the important thing is he's got to be more than just incorrect. He's got to be some evidence that he's being intentionally untruthful, I think is the level that we have to prove here to show that he's part of this conspiracy. Again, there has to be a conspiracy for him to be a co-conspirator as well. And obviously, that goes without saying, but if the rest of the case is not going to be sent back, then he can't be sent back by himself, of course. But the question is, what did he do? There's the allegation of the lie. There's the lawsuit where it's been suggested that he was in the background sort of encouraging that, but that's nothing more than an inference. Even in plaintiff's own argument, they acknowledge that's just an inference that they believe is reasonable. I don't think it makes a lot of sense. He's not a lawyer, wasn't a party to the suit, and he wasn't an employee of the plaintiff of that suit. He was an employee of the city. So then we get to that, again, nothing to do with this contract between the city and the disability network. There's no even suggestion that he was involved in that. So we don't have a lot to work with. What we have, and I think this is an example of the reply, where Mr. Briggs even said something the plaintiff agreed with, and that's reframed as, quote, a performance gesture and supposedly part of the cover-up. I mean, the man can, he's darned if he does, and he's darned if he doesn't. Anything he does is apparently evidence that he's conspiring against the plaintiff. So with that, any questions for me? I think not. All right. Mr. Ellison, you had your rebuttal time. Thank you very much. I would just like to point out, I guess, the standard from addicts, I think, is applicable here, because what we're hearing today is explanations of their view of the evidence. And what we're saying here is, is that when you string these different pieces together, a sufficient quilt has been made between all these different pieces of evidence. And each of my colleagues here today have pointed out with little pieces about how this little piece doesn't work and this little piece doesn't work. When it's at least plausible that there is a conspiracy among them in that respect, the person that gets to answer whether, in fact, there is that conspiracy is the jury, not the judge as a matter of law. And that's the part, I guess, what Adekis, I think, is, Adekis or addicts, however, you know, whatever say you want to say it, I think is what establishes that particular standard for this court that it must follow. And that I think some courts have not necessarily religiously followed. The courts that I would point, I would also point this court to is the Ninth Circuit's decision in Nissan as well, which talks at great length about how addicts should be applied in circumstances like this. In addition to this, in addition to all of this as well, is that I didn't hear anybody today say the building is ADA compliant because it's not. Now, I agree, Judge Rayler, you pointed out in the beginning of this is whether that is the, that is not necessarily a dispositive fact with the way the claims are put in this case. But wouldn't the best evidence be that there's not a cover-up of an ADA violation of the fact the building is, in fact, ADA compliant? And what we have here today is not a single, a single defendant here today willing to defend that building. But there's a difference of, there's a difference of, there's a difference of opinion about it. And I think the issues of litigation, so I wouldn't expect him to come in today and say too much about it. Well, fair enough. But I think, you know, what do you think is your, do you think your First Amendment, First Amendment arguments are stronger or do you think your statutory claims are stronger? I think it depends on the defendant. I think for the, for Disability Network West Michigan, I think the ADA retaliation claim is the strongest claim against them. I think for the city's, for the city's aspect of it, it's the First Amendment retaliation under Section 1983. The difficulty in this case is that for, and I will acknowledge that Disability Network is not per se a government actor, but they can be held liable under the civil conspiracy theory. The civil conspiracy theory, I think, is what's giving everybody the most heartburn in this case right now is trying, how do you read these things together? Disability Network clearly retaliated on the basis of the fact that they filed a lawsuit. We're asserting had no basis in fact whatsoever or was warranted by law. And I, and I think the court can underlie and read all of that because I think Disability Network's brief did some very unique editing as to what the district, or excuse me, the state court did and it's, and what it reached a decision. And of course the ironic twist of all of this, we talk about they ran out of money. We were within days of trial. Everything had been done at this point and Disability Network decides to drop the case, which if they were trying to defend, especially given that this federal court case was already filed and pending in that respect, their best evidence would have been to establish that that building, that the miscanter was being defamatory and making false statements about the building. And they fail, not only did they fail, they got dismissed with prejudice, which I think bars them from relitigating that claim going forward that, that her acts were in fact defamatory in any way. The whole point of all of this. The fact it was close to trial also means that your summary judgment motion was denied. So you're saying this is a slam state court thought it wasn't. And under this baseless standard, it would seem like the denial of summary judgment against your client shows that there was at least something there that should go to the jury. Now the case didn't go to the jury for other reasons, but it seems like at least one, one judicial officer looked at the case, thought there was at least something there. But I think that's what goes to the heart of the conspiracy here is the fact that these um, um, Mr. Briggs, as well as the city's a position about the, how this building was in fact ADA compliant. And that was what, that's what the state court based its debate, based its decision on to deny summary judgment says I got to have an answer to that. And of course, when the answer to that question is being laid before the court for that determination, for that decision, disability network says we're pulling out, we're dropping this entire case. I get the other court that I mentioned earlier, and I want to make sure this court has it, at least in the audio recording is, is Wink versus O'Reilly. And that is a 383 F third 585. And in that case, there was a mandatory reporter who reported something he was obligated by law to report. And still it was first amendment retaliation. So I would ask this court to, I'm sorry. No, finish your sentence. I was just going to say, I appreciate the court's time today. And if the court has any other questions, we thank you for your time. And we ask that you reverse. We appreciate the arguments that all of you given and we'll consider the case carefully.